# Exhibit 4

## SECOND AMENDED AND RESTATED FORBEARANCE AGREEMENT

This Second Amended and Restated Forbearance Agreement (the "Agreement") dated this 29th day of July, 2021 and effective as of June 30, 2021 (the "**Effective Date**") between MARINE BANK, an Illinois banking association (the "**Lender**"); CHARLES E. LOTZ ("**Charles**") and LYNN M. LOTZ ("**Lynn**"); SCB, INC. (the "**SCB**"); ANIMAL MEDICAL CENTER OF MACOMB, LTD. ("**AMC**" and together with Charles, Lynn, and SCB each a "**Borrower**" and collectively the "**Borrowers**") amends and restates that certain Forbearance Agreement dated and effective November 23, 2020 and that certain First Amended and Restated Forbearance Agreement dated January 28, 2021 and effective as of November 23, 2020 (collectively, the "Original Agreement").

## RECITALS

WHEREAS, Lender extended a term loan to Charles and Lynn evidenced by Promissory Note (No. 37887-75) dated September 21, 2012 in the original principal amount of $52,000.00 and a Change in Terms Agreement (No. 37887-75) dated August 14, 2015 in the original principal amount of $47,010.64 and a Change in Terms Agreement (No. 37887-75) dated August 20, 2020 in the original principal amount of $38,560.81 with a current principal balance of $37,943.90 (together with all amendments or modifications thereof, the "**Note 75**").

WHEREAS, Note 75 is secured by first-priority perfected Mortgage liens (with assignments of rents); Assignments of Rents, and Commercial Security Agreements (with corresponding UCC-1 financing statement filings for rents) with respect to an improved parcel of real property in Macomb, Illinois as set forth in the attached Collateral Schedule (the "**Note 75 Collateral**").

WHEREAS, Lender extended a term loan to Charles and Lynn evidenced by Promissory Note (No. 37887-80) dated October 19, 2012 in the original principal amount of $2,415,946.88 and a Change in Terms Agreement (No. 37887-80) dated August 14, 2015 in the original principal amount of $2,205,289.08 with a principal balance of $1,867,336.71 as of January 27, 2020 (together with all amendments or modifications thereof, the "**Note 80**"). Charles and Lynn have continued to tender regular monthly payments as set for in Note 80, which reduced the amount owed to $1,726,514.05 as of January 28, 2021.

WHEREAS, as set forth in detail on page 4 of this Agreement, on January 27, 2020 the Circuit Court for the Ninth Judicial Circuit – McDonough County, Illinois entered an Order granting separate judgments by confession against each of Charles E. Lotz and Lynn M. Lotz with respect to Note 80, the amount of $1,846,354.52, with a current outstanding balance of $1,675,690.45.

WHEREAS, Note 80 is secured by first-priority perfected Mortgage liens (with assignments of rents); Assignments of Rents, and Commercial Security Agreements (with corresponding UCC-1 financing statement filings for rents) with respect to several improved and unimproved parcels of real property in Macomb, Illinois as set forth in the attached Collateral Schedule (the "**Note 80 Collateral**").

WHEREAS, Lender extended a term loan to Charles and Lynn evidenced by Promissory Note (No. 37887-90) dated June 27, 2013 in the original principal amount of $52,000.00 and a Change in Terms Agreement (No. 37887-90) dated June 29, 2016 in the original principal amount of $47,241.54 with a current principal balance of $37,666.83 (together with all amendments or modifications thereof, the "**Note 90**").

1

WHEREAS, Note 90 is secured by first-priority perfected Mortgage liens (with assignments of rents); Assignments of Rents, and Commercial Security Agreements (with corresponding UCC-1 financing statement filings for rents) with respect to an improved parcel of real property in Macomb, Illinois as set forth in the attached <u>Collateral Schedule</u> (the "**Note 90 Collateral**").

WHEREAS, Lender also extended a term loan to SCB, Inc. evidenced by Promissory Note (No. 11021724-27600) dated December 28, 2017 in the original principal amount of $960,000 and Change in Terms Agreements (No. 11021724-27600) dated June 28, 2018, September 18, 2018, December 28, 2018, and March 28, 2019, with a current principal balance of $926,259.73 (together with all amendments or modifications thereof, the "**SCB Note**"), and Charles, Lynn and AMC guaranty the payment of the SCB Note.

WHEREAS, the SCB Note is secured by a first-priority perfected Mortgage lien (with assignments of rents); Assignments of Rents, and Commercial Security Agreements (with corresponding UCC-1 financing statement filings for rents) with respect to a certain improved parcel of real property commonly known as 823 E. Jackson, Macomb, Illinois and Commercial Guaranties of payment from Charles, Lynn, and AMC as set forth in the attached <u>Collateral Schedule</u> (the "**SCB Note Collateral**" and together with the Note 70 Collateral, the Note 80 Collateral, and the Note 90 Collateral, the "**Original Collateral**").

WHEREAS, Charles and Lynn tender monthly real estate tax escrow payments to Lender, which are held in escrow to pay the real estate taxes on the Note 80 Collateral (the "Real Estate Tax Escrow").

WHEREAS, the tax assessment value of the Note 80 Collateral was reduced, which established surplus escrow funds in the Real Estate Tax Escrow in the amount of $22,532.08 (the "Escrow Surplus").

WHEREAS, Lender has agreed to make the Escrow Surplus available to pay for Lender-approved repairs and maintenance to real property that secures loans from Lender utilizing the <u>Repair and Maintenance Funding Procedures</u> (as defined below). Funds will be held in the "Charles E. Lotz FBO Marine Bank" a controlled account No. 90698.

WHEREAS, pursuant to the Judgments (as defined below), Lender is entitled to apply the Escrow Surplus to the Judgments, but Lender is willing to apply it as set forth in this Agreement, subject to the terms and conditions of this Agreement.

WHEREAS, the words "**Note**" or "**Notes**") shall mean collectively Note 75, Note 80, Note 90, and the SBC Note.

WHEREAS, on August 30, 2019 Borrowers pledged, and/or caused to be pledged, a first-priority security interest in the following checking accounts Nos. 52108, 52167, 508861, 515124, and 517682, all held at Lender in the names of one or more Borrowers, as well as affiliate Lotz Property Management, to secure the Notes and certain other indebtedness of one or more Borrowers (the "**Lotz Accounts**").

WHEREAS, the Notes and related documents contain the following default provisions:

- **Payment Default.** Borrower failed to make any payment when due under this Note.

- **Other Defaults.** Borrower failed to comply with or to perform any other term, obligation, covenant or condition contained in the Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

- **False Statements.** One or more warranties, representations or statements made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents were false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

- **Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

- **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession, or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.

- **Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

- **Adverse Change.** A material adverse change occurred in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

- **Insecurity.** Lender in good faith believes itself insecure.

WHEREAS, Borrowers committed following events of default (the "**Existing Events of Default**"):

1. Borrowers have suffered a material adverse change in financial condition and their business operations that will materially affect the Borrowers' ability to pay the Notes and the ability Charles and Lynn to pay their Commercial Guaranties of the SCB Note. Western Illinois University ("WIU") is suffering from significant declines in student enrollment, which has negatively impacted the economy of Macomb as a whole including businesses outside of student housing and reducing the value of Macomb real estate in general.

2. Charles and Lynn have been named as defendants in a twelve (12) count foreclosure case filed on August 22, 2019 by United Community Bank based upon promissory note indebtedness in excess of $4,500,000 in Count IX, and a receiver has been appointed by the court. The foreclosure counts carry a likelihood of substantial deficiency

judgments given the state of the economy in Macomb, IL and its depressed real estate market.

3. Lender obtained the Judgments against Charles and Lynn (as defined below) which constitute events of default for their other direct obligations, being Note 75 and Note 90, as well as the obligations for which they guaranty payment, being SCB Note that is guaranteed by Charles and Lynn.

4. These events set forth above are material adverse changes in Borrowers' financial condition that impair the prospect of payment or performance of the Notes and associated guaranties from Charles and/or Lynn. This creates a material adverse change that impairs the prospect of payment or performance of the SCB Note that is guaranteed by Charles and Lynn.

5. Lender requested that one or more Borrowers provide additional collateral for the Notes.

6. Recently, the Lender discovered that 19.28 acres of farmland that the Charles and Lynn agreed to pledge to secure Note 80 had not been pledged and needed to be pledged (the **"Acreage"**).

7. Borrowers failed to provide additional collateral beyond the pledge of the Lotz Accounts and did not pledge the Acreage.

8. These events established a good faith belief that Lender is insecure based upon Borrowers' financial condition.

WHEREAS, Lender is entitled to pursue any or all the remedies stated in its loan documents, including, but not limited to, the following:

- To demand immediate payment of all amounts owed.
- To demand security, additional security, or additional parties to be obligated to pay said note as a condition for not using any other remedy.
- To use any remedy available under state or federal law.

WHEREAS, on January 17, 2020 Lender filed a two count Application for Entry of Judgment by Confession with respect to Note 80 (Case No. 20 LL 0001), and on January 27, 2020 the Circuit Court for the Ninth Judicial Circuit – McDonough County, Illinois entered an Order granting separate judgments by confession against each of Charles E. Lotz and Lynn M. Lotz and each in the total aggregate amount of $1,846,354.52 (collectively the **"Judgments"**) and executed Memoranda of Judgment, which were recorded on January 27, 2020 McDonough County, Illinois Recorders Office as Document #: 2020-233 with respect to Charles E. Lotz and as Document #2020-234 with respect to Lynn M. Lotz (collectively, the **"Memoranda of Judgments"**).

WHEREAS, Charles and/or Lynn pledged and/or agreed to pledge, liens on certain additional collateral to secure the Notes and Judgments including following:

4

- Deed of Trust, dated November 23, 2020, in the amount of $500,000.00, for the improved real property commonly known as 1506 S. 12th Avenue, Ozark Missouri, recorded on November 25, 2020 as Document No. 2020L20196 Book 2020, Page 20006 in Christian County Missouri (the "Missouri Property");

- Deed of Trust, dated November 23, 2020, in the amount of $500,000.00, for the improved real property commonly known as 1101 Wood Creek Circle, Flower Mound, Texas, recorded on December 2, 2020 as Document No. 196910 in Denton County Texas;

- Commercial Security Agreement dated November 23, 2020, pledging a blanket lien on all assets, including all rents at 432 West Jefferson Street, 406 South Clay Street and 517 North Campbell Street, Macomb, Illinois;

- Motor Vehicle Security Agreement dated November 23, 2020 pertaining to the vehicles listed on the Additional Collateral Schedule of this Agreement;

- Pledge Agreement dated November 23, 2020 from Charles pertaining to his ownership in Loop & Lotz Investments, Inc., an Illinois corporation, evidenced by share Certificate #1 for 5,000 shares, however the Collateral Receipt, Irrevocable Stock Power or entitlement Order have not been signed (the "Loop & Lotz Unsigned Documents");

- Pledge Agreement dated November 23, 2020 from Charles pertaining to his ownership in Animal Medical Center of Macomb, Ltd., an Illinois corporation, evidenced by share Certificate #9 for 833 shares, however the Collateral Receipt, Irrevocable Stock Power or entitlement Order have not been signed (the "AMC Unsigned Documents");

- Pledge Agreement to be executed by Charles pertaining to his ownership in SCB, Inc., an Illinois corporation, evidenced by share Certificate #1 for 100 shares, however the Pledge Agreement, Collateral Receipt, Irrevocable Stock Power or entitlement Order have not been signed (the "SCB Unsigned Documents");

- Pledge Agreement to be executed by Charles pertaining to his ownership in Discount Furniture & Bedding of Macomb, Inc., an Illinois corporation, evidenced by share Certificate #1 for 100 shares, however the Pledge Agreement, Collateral Receipt, Irrevocable Stock Power or entitlement Order have not been signed (the "Discount Furniture Unsigned Documents" and together with the Loop & Lotz Unsigned Documents, AMC Unsigned Documents, and the SCB Unsigned Documents, the "Unsigned Documents");

WHEREAS, the Missouri Property was sold with net proceeds of $128,409.30, and Borrowers and Lender agreed to allocate certain portions of these proceeds as follows:

- Chuck and Lynn received $25,000.00 to be allocated to fund legal costs and expenses;

- Lender received $75,000.00, from which $50,000.00 was applied to reduce the principal balance of the Note 80, and $25,000.00 would be made available to pay for Lender-approved

repairs and maintenance to the real property that secures Notes and Judgments utilizing the <u>Repair and Maintenance Funding Procedures (the "Missouri Proceeds")</u>. Funds will be held in the "Charles E. Lotz FBO Marine Bank" a controlled account No. 90698.

WHEREAS, Borrowers have requested that Lender forbear from (i) exercising its rights and remedies under the Notes and related loan documents and (ii) executing and/or colleting upon the Judgments or Memoranda of Judgments.

WHEREAS, Lender is willing to forbear from exercising its rights and remedies under the Notes, related loan documents, the Judgments and Memoranda of Judgments for the limited period of time set forth in this Agreement, so long as Borrowers accept, agree, comply, and continue to comply with the terms and conditions in this Agreement set forth below.

NOW, THEREFORE, in consideration of the Recitals set forth above, which are incorporated herein by reference, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, Lender and Borrowers agree as follows:

1. FORBEARANCE AND RELATED PROVISIONS.

1.1 Borrowers and Lender each acknowledge and agree that the Recitals are accurate and correct, and the Recitals are incorporated herein by reference.

1.2 Borrowers acknowledge and agree that Borrowers' liabilities arising out of the Notes, the guaranties, the commercial security agreements, the mortgages, the assignments of rents, all related documents, the Judgments, the Memoranda of Judgments, or any other documents or instruments executed in connection therewith are the valid obligations of Borrowers and, as of the date hereof, there are no claims, setoffs or defenses to payment by Borrowers of their liabilities, and that Lender may enforce the payment of Borrowers' liabilities as set forth in the Agreement, Notes, the guaranties, the Judgments, the Memoranda of Judgments, or any other document or instrument executed in connection therewith.

1.3 Borrowers each acknowledge and agree that Borrowers have committed the Existing Events of Default under the Notes, commercial security agreements, mortgages, assignment of rents, and other loan documents that form the basis of the Judgments and Memoranda of Judgments, and that those defaults continue to exist as of the date hereof and will continue to exist after the execution of this Agreement, that any and all cure periods have expired, and that Borrowers are presently obligated to pay all liabilities to Lender under the Notes, the Judgments, the Memoranda of Judgments, all without setoff, counter claim or defenses.

1.4 So long as Borrowers comply with the terms and provisions set forth in this Agreement, including specifically those set for in Section 1.5 of this Agreement:

(a) the Notes, the guaranties, the commercial security agreements, the mortgages, the assignments of rents, the Judgments, the Memoranda of Judgments, and all related documents, and no new Events of Default (as defined in Section 1.8, 1.9, and 2.1 of this Agreement or the Loan Documents (as defined below), Lender will forbear from exercising its rights and remedies through **December 31, 2021** (the "**Forbearance Period**").

6

(b) In the event Charles and/or Lynn file bankruptcy during the Forbearance Period, and Charles and Lynn offer to reaffirm all of their Notes, guaranties of indebtedness to Lender, and the Judgements under the existing terms and conditions for each as set forth in Section 1.5(g)(1), (2) and (3) below, then so long as all Borrowers that have filed for bankruptcy have offered to reaffirm all of their obligations to Lender, then Lender agrees to accept these reaffirmations.

(c) <u>Establishment of Repair and Maintenance Reserves</u>. Lender made the Escrow Surplus in the amount of $22,532.08 and the Missouri Proceeds in the amount of $25,000.00 ($47,532.08 in aggregate) available to pay for Lender-approved repairs and maintenance to real property that secures loans from Lender pursuant to the <u>Repair and Maintenance Funding Procedures set for below</u>. These funds will be held in the "Charles E. Lotz FBO Marine Bank" a controlled account No. 90698, and the current balance of the remaining funds is $25,502.41.

(d) <u>Repair and Maintenance Reserves and Funding Procedures</u>.

**(1)** Prior to having any services performed or materials provided, Charles will identify to Lender for Lender's approval the real property that secures loans from Lender that needs repairs and/or maintenance, and the scope and cost of the of work being requested. Charles will provide all information, bids, proposals, estimates, and/or contracts that he has obtained, as well as any additional information that Lender requests. Lender's consideration and approval will not be unreasonably withheld or delayed.

**(2)** Once the work has been approved and completed, Charles will submit invoices to Lender, and Lender will pay the contractors, subcontractors, and/or material suppliers directly in exchange for lien waivers and/or receipts (as appropriate).

**(3)** Charles may also deliver to Lender invoices, receipts and/or lien waivers (as appropriate) for (i) work performed prior to the date of this Agreement, or (ii) completed work that he has paid directly, and Lender will pay the contractors, subcontractors, and/or material suppliers directly in exchange for lien waivers and/or receipts or reimburse Charles for his prior payment (as appropriate).

1.5 Failure of Borrowers to comply with any of the requirements set forth in this Section shall be a default under this Agreement, the Notes, the guaranties, the commercial security agreements, the mortgages, the assignments of rents, the Judgments, the Memoranda of Judgments, and all related documents:

(a) **Current Financial Statements:** On or before the execution of this Agreement Charles and Lynn shall provide Lender updated, current, signed and dated personal financial statements, and SCB and AMC shall provide Lender updated, current, signed and dated financial statements (collectively, the **"Financial Statements"**).

(b) **Additional Collateral Pledge:** Borrowers shall pledge certain additional collateral to Lender to secure the Notes and the as set forth in the attached <u>Additional Collateral Schedule</u> (the **"Additional Collateral"** and together with the Original

7

Collateral and the **Lotz Accounts**, the **"Collateral"**), and Borrowers shall execute such documents and tender such deliveries that Lender requires to establish pledge the Collateral.

(c) **Lease Information:** Upon request, Borrowers shall provide Lender with executed copies of all leases pertaining to the Collateral (the collectively the **"Leases"** and individually a **"Lease"**).

(d) **Lease Payments Directly to Lender:** All lease payments received by Borrowers pursuant to Leases shall, immediately upon receipt, be directly deposited into a separate account with Lender (the "Lease Payment Account"), and Borrower shall provide a detailed accounting that reconciles the payments/deposits with each tenant and property as requested by Lender. To the extent that Borrower utilizes AppFolio or other similar property management software applications to collect rent for the Collateral, Borrower shall: (i) take all actions necessary to segregate payments related to the Collateral into a separate account within the software application, (ii) take all actions necessary to grant Lender access to such software application account, (iii) cause funds passing through the software application to be immediately and directly deposited into the Lease Payment Account, and provide Lender with Appfolio ACH printouts or spreadsheet containing information regarding rents received enabling Lender to balance and verify payments. Lender agrees that so long as Borrowers are not in default of this Agreement, amounts deposited in the Lease Payment Account will be available to Borrowers for the purposes of reasonable maintenance and upkeep and other expenditures necessary for the leased properties to be competitive in the marketplace.

(e) **Security Deposits for Collateral:** Establish a new account with Lender, and all security deposits received by Borrowers pursuant to Leases and in Borrowers' possession, shall be deposited into a separate account with Lender (the "Security Deposit Account"), and Borrower shall provide a detailed accounting that reconciles these deposits with each tenant and property as requested by Lender. Lender agrees that any and all security deposits which are due and payable to tenants of the leased properties shall be paid out of the Security Deposit Account and Lender will not withdraw or set off any amounts from the Security Deposition Account.

(f) **Lien on Accounts:** Borrower shall grant Lender a security interest in and/or pledge of the Lease Payment Account and the Security Deposit Account to secure the Notes, the Judgments, the Memoranda of Judgments, together with a corresponding UCC-1 financing statement subject to the limitations set forth in Section 1.5(d) and 1.5(e) above.

(g) **Maturity Extension of Note 75, Note 90, and the SBC Note:** To the extent that Note 75, Note 90, and/or the SBC Note have or will mature during any past "forbearance period" set forth in the Original Agreement or the Forbearance Period set forth in this Agreement, the Original Agreement shall extend the maturities of such Notes through the "forbearance period" contained therein, and this Agreement shall extend the maturities of such Notes through the Forbearance Period contained herein.

(h) **Payments on the Notes and Judgments:** The Borrowers shall make the following payments during the Forbearance Period (the "Forbearance Payments"):

8

(1) *Payments on Note 75, Note 90, and the SBC Note:* Borrowers shall continue to tender the regular timely monthly payments to Lender based upon the interest rates and payment terms as set forth in each of Note 75, Note 90, and the SBC Note through the Forbearance Period.

(2) *Payments on the Judgments Replacing Note 80:* Under the terms of Note 80, the non-default interest rate was a fixed rate of four percent (4.0%), however the subsequent interest rate on the Judgments is the statutory fixed interest rate of nine percent (9.0%) commencing on the date of the Judgments, being January 27, 2020, with respect to the Judgment amount of $1,846,354.52. Lender will accept, and Charles and Lynn will tender monthly payments on their Judgments in an aggregate/total amount equal to the amount that would have been due under the terms of Note 80 at a fixed interest rate of four percent (4.0%) through the Forbearance Period.

(A) **Provided however, upon the occurrence of a new Event of Default (as defined below), the full statutory fixed interest rate of nine percent (9.0%) will become due and payable to Lender commencing retroactively to the date of the Judgments, being January 27, 2020.**

(3) *Payment Adjustment During the Forbearance Period:* **Notwithstanding and in addition to the forgoing, Lender has agreed to the following payment adjustments during the initial Forbearance Period: (i) the interest rate on the Notes and the Judgements (subject to Lender's right to accelerate the Judgment interest rates as set forth in Section 1.5(2)(A)) to Lender during the initial Forbearance Period will be temporarily reduced to a fixed rate of three and one-quarter percent (3.25%), and (ii) in lieu of regular monthly payments of principal and interest on the Notes and the Judgments as set forth in Sections 1.5(g)(1 and 2) above, Lender will accept monthly payments of interest only, together with Borrower's continued monthly real estate tax escrow payment obligations related to the Note 80 Collateral. Provided however, upon the occurrence of a new Event of Default (as defined below), the full interest rate in each Note will be restored and will become due and payable to Lender commencing retroactively to the date of this Agreement.**

(i) **Inspections and Appraisals:** Borrowers shall permit, facilitate, and cooperate with Lender to have the Collateral inspected and appraised by Lender and its agents at Lender's discretion.

(j) **Management Fees, Salaries, Distributions, Dividends, and/or Withdrawals:** No Borrower, or any relative thereof, shall receive any management fee, salary, distribution, dividend, or withdrawal of funds from Borrowers. Notwithstanding the forgoing, Charles may continue to receive a reasonable salary from AMC not to exceed $150,000, Lynn may continue to receive salary from Lotz Property Management of $30,000, and AMC may pay customary rent to SCB for the veterinary clinic of $8,000 per month.

(k) **Financial Reporting:** Borrowers shall provide Lender with balances sheets, profit and loss statements, leasing updates (including percentage to market if relevant) on a quarterly basis.

      (l)    **Demolition of 119 N. Campbell, Macomb, Illinois and Application of Related Insurance Proceeds:** Borrowers shall take all actions necessary to demolish and remove debris as this property suffered significant fire damage (the **"Demolition"**), and list the vacant lot for sale. The proceeds from the fire loss insurance claim from Country Financial, after a $10,000.00 off-set from the insurance company to satisfy the policy's deductible, in the amount of $24,868.64 (the **"Insurance Proceeds"**), upon which Lender hold a perfected first-priority lien, are being held in Marine Bank account No. 90698. Borrowers shall be responsible for the demolition costs and shall provide Lender with copies of all corresponding invoices and lien waivers. Pursuant to Lender's rights under its corresponding mortgage, Lender applied the Insurance Proceeds to reduce the balance of the Judgments.

      (m)    On or before the execution of this Agreement Charles and Lynn shall execute all Unsigned Documents and return the originals to Lender.

      1.6    The Borrowers release, waive and affirmatively agree not to allege or to otherwise pursue any or all defenses, affirmative defenses, counterclaims, claims, causes of action, setoffs or other rights that they may have, as of the date hereof, in any current or future litigation, to contest (a) any default which could be declared by Lender at the date hereof; (b) any provision of the Notes, the Judgments, the Memoranda of Judgments, any other document or instrument executed in connection therewith, or this Agreement; (c) the right of Lender to all of the rents, issues, profits and proceeds from the collateral except as otherwise set forth herein; (d) the security interest of Lender in any property, whether real or personal, tangible or intangible, or any right or other interest, arising in connection with the collateral; or (e) the conduct of Lender in administering the financing arrangements by and between the Borrowers and Lender.

      1.7    Future administration of the financing arrangements between the Borrowers and Lender shall continue to be governed by all of the terms and conditions of the Notes, the guaranties, the commercial security agreements, the mortgages, the assignments of rents, the Judgments, the Memoranda of Judgments, all related documents, or any other document or instrument executed in connection therewith, except to the extent that the same have been amended and supplemented by this Agreement. To the extent that any provision of this Agreement conflicts with any term or condition set forth in the Notes, the guaranties, the commercial security agreements, the mortgages, the assignments of rents, all related documents, the Judgments, the Memoranda of Judgments, or any other document or instrument executed in connection therewith, and the provisions of this Agreement shall supersede and control.

      1.8    The forbearance from Lender to the Borrowers as set forth herein shall terminate upon the earliest to occur of the following: (a) the expiration of the Forbearance Period, (b) the occurrence of an Event of Default as defined herein, or (c) the occurrence or reoccurrence of an event of default as defined in the Notes, the guaranties, the commercial security agreements, the mortgages, the assignments of rents, all related documents, or any other document or instrument executed in connection therewith (**"Loan Documents"**), and the provisions of this Agreement shall supersede and control. As used herein, an "Event of Default" shall only apply to new events or changes in circumstance, or to new events that materially and adversely affect the present state of the Borrowers' or guarantors' financial affairs as set forth in the respective Financial Statements. The continuation of the present level of Insolvency of a Borrower or guarantor; any presently appointed Receiver; any presently existing Creditor or Forfeiture

Proceeding (excluding any resulting deficiency therefrom); any presently existing Events Affecting Guarantor; any presently existing Adverse Change; or any presently existing Insecurity shall not be considered an "Event of Default" under this Agreement or the Loan Documents. To the extent the Loan Documents define Events of Default to include Insolvency of Borrower or Guarantor; Appointment of a Receiver; Creditor or Forfeiture Proceedings; Events Affecting Guarantor; Adverse Change; or Insecurity, no such facts presently existing which constitute an Existing Event of Default as of the Effective Date of this Agreement (excluding any deficiency resulting from any Creditor or Forfeiture Proceedings) shall terminate the Forbearance Period (the **"Event of Default Exclusions"**).

1.9  Notwithstanding the Event of Default Exclusions set forth in Section 1.8 of this Agreement, if any new (not currently existing) facts or materially worsening facts constitute an Event of Default (as defined in Section 2.1. of his Agreement) in the performance of the Borrowers' obligations as defined in the Loan Documents, as may be modified by this Agreement, or in this Agreement shall occur subsequent to the date hereof (including any deficiency resulting from any Creditor or Forfeiture Proceedings), this forbearance and the Agreement shall be deemed void and of no effect *ab initio*, at the election of Lender.

1.10  Upon the occurrence of an Event of Default (as defined in Sections 1.5, 1.8, 1.9 and/or 2.1) hereunder, Lender may, at its option, declare the Borrowers' liabilities to be immediately due and payable, all without demand, presentment or other notice of any kind, all of which are hereby expressly waived; and thereafter Lender shall be entitled to immediately exercise any and all rights and remedies available to Lender herein and in the Notes, the guaranties or any other document or instrument executed in connection therewith, and/or with respect to the execution and enforcements of the Judgments and Memoranda of Judgments.

2. EVENTS OF DEFAULT

2.1  Each of the following shall constitute Events of Default under this Agreement (each an **"Event of Default"** or collectively **"Events of Default"**):

- **Payment Default.** Borrower failed to make any payment when due under this Agreement.
- **Other Defaults.** Borrower failed to comply with or to perform any other term, obligation, covenant, or condition contained in this Agreement.
- **False Statements.** One or more warranties, representations or statements made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement were false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.
- **Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of an additional receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

11

- **Creditor or Forfeiture Proceedings.** Commencement of additional foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession, or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.

- **Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor of any of the indebtedness or any guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Agreement.

- **Adverse Change.** A new material adverse change occurred in Borrower's financial condition, any material worsening of an existing adverse situation pertaining to Borrower's current financial condition, or Lender believes the prospect of payment or performance of this Agreement is impaired.

- **Sections 1.8 and 1.9 of this Agreement.** Events of default as set forth in Sections 1.8 and 1.9 of this Agreement.

3. MISCELLANEOUS.

3.1   All terms used herein and defined in the Uniform Commercial Code as adopted in the State of Illinois shall have the meaning given therein unless otherwise defined herein.

3.2   Notice.  Any notice or request hereunder may be given to the Borrowers, or to Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section. Any notice or request hereunder shall be given by regular mail, overnight courier, registered or certified mail, return receipt requested, electronic mail, or by facsimile. Notices and requests shall, in the case of those by mail, be deemed to have been given when deposited in the mail as provided in this Section.

(A)   If to Lender:   Marine Bank
1661 E. Jackson St.
Macomb, Illinois 61455
Attention: Michael Clemens, SVP
mclemens@ibankmarine.com

With a copy to:   Marine Bank
3120 Robbins Road
Springfield, Illinois 62704
Attention: Legal Department
hneuger@ibankmarine.com

(B)   If to Charles and Lynn Lotz:

Charles and Lynn Lotz
2000 Lakewood Drive

           Macomb, Illinois 61455
           lotzmom@hotmail.com or lotz5@hotmail.com

   With a copy to:  R. Thomas Avery, Esq
           Cape Sokol
           8182 Maryland Ave., Fifteenth Floor
           St. Louis, MO 63105
           rtavery@bbdlc.com

 (C)  If to any other Borrower:

           Charles Lotz
           2000 Lakewood Drive
           Macomb, Illinois 61455
           lotzmom@hotmail.com or lotz5@hotmail.com

   With a copy to:  R. Thomas Avery, Esq.
           Cape Sokol
           8182 Maryland Ave., Fifteenth Floor
           rtavery@bbdlc.com

     3.3  Survivability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall not invalidate the remainder of such provision or the remaining provisions of this Agreement.

     3.4  Captions. The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

     3.5  Counterparts and Facsimile Signatures. This Agreement may be executed in one or more counterparts, each of which taken together shall constitute one and the same instrument, and facsimile signatures shall operate as original signatures.

     3.6  Inconsistencies with Loan Documents. To the extent that any inconsistencies or conflicts arise between the terms of this Agreement and any of the loan documents, this Agreement shall control.

     3.7  Not Binding on Third-Party Borrowers. This Agreement is not binding with respect to any third-party obligor that has not signed this Agreement, and no such third-party obligor shall have any beneficial rights hereunder.

     3.8  Waiver of Jurisdiction. EACH OBLIGOR HEREBY AGREES TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN SANGAMON COUNTY, ILLINOIS. EACH OBLIGOR CONSENTS THAT ALL SERVICE OR PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO SAID EVANS OBLIGOR AND LENDER AT THEIR ADDRESSES SET FORTH HEREIN AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE (5) BUSINESS DAYS AFTER

*S:\Legal\Lotz, Charles\Second Amended and Restated Forbearance Agreement - 7-22-2021 CLEAN.docx*

THE SAME SHALL HAVE BEEN DEPOSITED IN THE U.S. MAILS, POSTAGE PREPAID. EACH OBLIGOR WAIVES ANY OBJECTION TO JURISDICTION OVER THE PERSON.

IN WITNESS WHEREOF, the Borrowers and Lender has executed this Forbearance Agreement as of day and date first above written.

**BORROWERS:**

_____
CHARLES E. LOTZ, Individually

_____
LYNN M. LOTZ, Individually

SCB, INC.

_____
By: Charles E. Lotz
Its: President and Secretary

ANIMAL MEDICAL CENTER OF MACOMB, LTD.

_____
By: Charles E. Lotz
Its: President

**BANK:**

MARINE BANK

_____
By:
Its: EVP/CLO

14

# COLLATERAL SCHEDULE

### Note 75 Collateral

Note 75 is secured by first-priority perfected Mortgage liens (with assignments of rents); Assignments of Rents, and Commercial Security Agreements (with corresponding UCC-1 financing statement filings for a blanket lien on all of Borrower's business assets, personal property and rents) with respect to the improved parcel of real property commonly known as 130 N. Ward, Macomb, Illinois 61455, Illinois (the **"Note 75 Collateral"**).

### Note 80 Collateral

Note 80, for which Lender has obtained Judgments was secured by first-priority perfected Mortgage liens (with assignments of rents); Assignments of Rents, and Commercial Security Agreements (with corresponding UCC-1 financing statement filings for a blanket lien on all of Borrower's business assets, personal property and rents) with respect to the following improved parcels of real property, with the following common addresses in Macomb, Illinois 61455, Illinois (the **"Note 80 Collateral"**):

    23.96 Acres   PIN 11-401-266-00
    41.69 Acres   PIN 04-000-059-00
    19.28 Acres   PIN 04-000-059-05

    916 East Jackson
    914 East Elm
    514 West Washington
    480 Deere Road
    403 South Dudley
    328 East Summit
    1635 East Pierce
    141 Chandler
    129 Chandler
    126 Barsi
    119 North Campbell
    104 Prairie
    1000 Lakewood Drive
    536 West McDonough
    1021 East Carroll

### Note 90 Collateral

Note 90 is secured by first-priority perfected Mortgage liens (with assignments of rents); Assignments of Rents, and Commercial Security Agreements (with corresponding UCC-1 financing statement filings for a blanket lien on all of Borrower's business assets, personal property and rents) with respect to the improved parcel of real property commonly known as 524 West Calhoun, Macomb, Illinois 61455, Illinois (the **"Note 90 Collateral"**).

15

**Note SCB Collateral**

Note SCB is secured by first-priority perfected Mortgage liens (with assignments of rents); Assignments of Rents, and Commercial Security Agreements (with corresponding UCC-1 financing statement filings for a blanket lien on all of Borrower's business assets, personal property and rents) with respect to the improved parcel of real property commonly known as 823 East Jackson, Macomb, Illinois 61455, Illinois (the **"Note SCB Collateral"**).

**Judgments**

Memoranda of Judgment, were recorded on January 27, 2020 in McDonough County, Illinois Recorders Office as Document #: 2020-233 with respect to Charles E. Lotz and as Document #2020-234 with respect to Lynn M. Lotz, which create a lien on all real property owned by either Charles E. Lotz or Lynn M. Lotz in McDonough County, Illinois, including but not limited to all collateral described above as well as the following:

| Property | PIN |
|---|---|
| 19.28 acres, Chalmers Twp., McDonough County, IL | 04-000-059-05 |
| 432 W Jefferson, Macomb, IL 61455 | 11-400-245-00 |
| 406 S Clay St, Macomb, IL 61455 | 11-400-516-20 |
| 517 N Campbell St, Macomb, IL 61455 | 11-200-382-00 |
| 816 E Carroll, Macomb, IL 61455 | 11-200-223-00 |
| 623 E Calhoun, Macomb, IL 61455 | 11-200-196-00 |
| 214 E Walker, Macomb, IL 61455 | 11-300-428-00 |

Lotz Residence plus 13 acres:
A tract of land located in the Southwest Quarter of Section 2, Township 5 North, Range 3 West of the Fourth Principal Meridian, McDonough County, Illinois, more particularly bounded and described as follows: Commencing at the Northeast corner of the Southwest Quarter of Section 2; thence South 00 degrees 00 minutes East along and upon the East line of said Quarter Section a distance of 902.40 feet to the point of beginning of the tract to be described; thence continuing South 00 degrees 00 minutes East along and upon said line a distance of 688.00 feet; thence North 90 degrees 00 minutes West, a distance of 304.00 feet; thence South 88 degrees 57 minutes 30 seconds West a distance of 363.85 feet; thence North 07 degrees 57 minutes East, a distance of 331.60 feet; thence North 89 degrees 54 minutes 24 seconds West, a distance of 226.34 feet; thence North 00 degrees 15 minutes East, a distance of 196.51 feet; thence North 88 degrees 05 minutes West, a distance of 852.38 feet; thence North 00 degrees 25 minutes East, a distance of 100.00 feet; thence South 88 degrees 05 minutes East, a distance of 852.08 feet; thence North 00 degrees 15 minutes East, a distance of 69.33 feet; thence South 90 degrees 00 minutes East, a distance of 846.67 feet to the point of beginning, subject to all easements appurtenant thereto, situated, lying and being in the County of McDonough, State of Illinois.

# ADDITIONAL COLLATERAL SCHEDULE

The Notes and Judgments are/shall be secured by liens on the following real property and personal property (the "**Additional Collateral**"):

## REAL PROPERTY

Borrowers shall execute a Deed of Trust on the property commonly known as 1506 S. 12th Avenue, Ozark, Missouri 65721, the legal description for which is:

> ALL OF LOT ELEVEN (11) IN SUN RIDGE 3RD ADDITION, A SUBDIVISION IN THE CITY OF OZARK, CHRISTIAN COUNTY, MISSOURI.

Deed of Trust on the property commonly known as 1101 Wood Creek Circle, Flower Mound Texas 75028, the legal description for which is:

> LOT 12 IN BLOCK 2, OF TIMBERCREEK ADDITION, AN ADDITION TO THE TOWN OF FLOWER MOUND, DENTON COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 12, PAGE 21, PLAT RECORDS, DENTON COUNTY, TEXAS.

## PERSONAL PROPERTY

Borrowers shall pledge their respective ownership interest in the following Collateral to secure the Notes:

### Loop & Lotz Investments, Inc.

To secure the Notes, Charles E. Lotz shall execute a Pledge Agreement, Collateral Receipt, and Irrevocable Stock Power or entitlement Order, each as provided by Lender, pledging his ownership in Loop & Lotz Investments, Inc., an Illinois corporation, as evidenced by Certificate No. 1, dated November 6, 1986 certifying that Charles E. Lotz owns 5,000 shares of Loop & Lotz Investments, Inc. ("Loop & Lotz Investments Certificate No. 1")  Charles E. Lotz shall also tender the original Loop & Lotz Investments Certificate No. 1 to Lender to complete the pledge of this Collateral.

### Animal Medical Center of Macomb, Ltd.

To secure the Notes, Charles E. Lotz shall execute a Pledge Agreement, Collateral Receipt, and Irrevocable Stock Power or entitlement Order, each as provided by Lender, pledging his ownership in Animal Medical Center of Macomb, Ltd., an Illinois corporation, as evidenced by Certificate No. 9, dated January 1, 1982 certifying that Charles E. Lotz owns 833 shares of Animal Medical Center of Macomb, Ltd. ("Animal Medical Center of Macomb Certificate No. 9")  Charles E. Lotz shall also tender the original Animal Medical Center of Macomb Certificate No. 9 to Lender to complete the pledge of this Collateral.

### SCB, Inc.

To secure the Notes, Charles E. Lotz shall execute a Pledge Agreement, Collateral Receipt, and Irrevocable Stock Power or entitlement Order, each as provided by Lender, pledging his ownership in SCB, Inc., an Illinois corporation, as evidenced by Certificate No. 1, dated September 26, 2017 certifying that Charles E. Lotz owns 100 shares of SCB, Inc. ("SCB Certificate No. 1")  Charles E. Lotz shall also tender the original SCB Certificate No. 1 to Lender to complete the pledge of this Collateral.

Discount Furniture & Bedding of Macomb, Inc.

To secure the Notes, Charles E. Lotz shall execute a Pledge Agreement, Collateral Receipt, and Irrevocable Stock Power or entitlement Order, each as provided by Lender, pledging his ownership in Discount Furniture & Bedding of Macomb, Inc., an Illinois corporation, as evidenced by Certificate No. 1, dated March 20, 2003 certifying that Charles E. Lotz owns 100 shares of Discount Furniture & Bedding of Macomb, Inc. ("Discount Furniture & Bedding of Macomb, Inc. Certificate No. 1")  Charles E. Lotz shall also tender the original Discount Furniture & Bedding of Macomb, Inc. Certificate No. 1 to Lender to complete the pledge of this Collateral.

<u>Vehicles Titled in Illinois</u>:

To secure the Notes, Borrowers shall execute a Commercial Security Agreement pledging the vehicles listed below and take all actions necessary to cause Lender to be added as a "Secured Lienholder" on each vehicle title:

| | | | | | |
|---|---|---|---|---|---|
| 10704412009810 | 1973 | Mercedes-Benz | 450 Series | Coupe | Charles & Lynn |
| 12803010002851 | 1960 | Mercedes-Benz | Convertible | 6 Cyl | Charles |
| 5GTDN136468142153 | 2006 | Hummer | 4Wheel Dr | | Charles & Lynn |
| 1G1YY22P2S5115473 | 1995 | Chevrolet | Corvette | Coupe | Charles |
| 1HFSC223XWA004200 | 1998 | Honda | GL1500SE | Motorcycle | Charles |
| 5NHUTS218EW055601 | 2014 | US Cargo | VTSPP612SA | Trailer | Lotz Property Management* |
| TD308296 | 2009 | Homemade | | Trailer | Lotz Property Management* |
| 482UU1829LA006070 | 1991 | Double L | Flatbed | Trailer | Lotz Property Management* |

*Lotz Property Management is a d/b/a. Confirm true owner as Charles or (Charles and Lynn), etc.

<u>Vehicles Titled in Illinois – However Titles are Missing</u>:

To secure the Notes, Borrowers shall execute a Commercial Security Agreement pledging the vehicles listed below. In addition, Borrowers shall take all actions necessary to cause a Duplicate Title to be issued for each vehicle and to add Lender as a "Secured Lienholder" on each duplicate vehicle title:

| | | | | | |
|---|---|---|---|---|---|
| 1FTFS24L3VHA38805 | 1997 | Ford Econoline | | | Charles |
| 1FTPX14594NA36641 | 2004 | Ford | F150 | Supercab | Lotz Property Management* |
| JTJBT20X540030946 | 2004 | Lexus | GX470 | | Lotz Property Management* |

*Lotz Property Management is a d/b/a. Confirm true owner as Charles or (Charles and Lynn), etc.

Charles and Lynn execute a Commercial Security Agreement pledging a blanket lien on all assets to secure the Notes and Judgments.

19